IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTIE LYNN HENDERSON, | ) | CASE NO.  4:21-CV-00381-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Christie Henderson ("Plaintiff" or "Henderson"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED for further consideration consistent with this opinion.

## I.    PROCEDURAL HISTORY

In July 2015, Henderson filed an application for POD and DIB, alleging a disability onset date of May 2, 2014 and claiming she was disabled due to Crohn's disease, carpal tunnel syndrome, depression, and anxiety.  (Transcript ("Tr.") at 12, 447, 141, 158.)  The application was denied initially and upon reconsideration, and Henderson requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 176.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On August 31, 2017, an ALJ held a hearing, during which Henderson, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On March 2, 2018, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 176-84.) On August 29, 2018, the Appeals Council vacated the ALJ decision and remanded Henderson's case back to the ALJ for further proceedings. (*Id.* at 190-92.)

On January 17, 2019, an ALJ held another hearing, during which Henderson, represented by counsel, and an impartial VE testified. (*Id.* at 90.) On February 6, 2019, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 199-208.) On November 23, 2019, the Appeals Council vacated the ALJ decision and remanded Henderson's case to an ALJ for further proceedings. (*Id.* at 215-19.)

On July 23, 2020, an ALJ held a hearing, during which Henderson, represented by counsel, and an impartial VE testified. (*Id.* at 12.) On September 2, 2020, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 12-25.) The ALJ's decision became final on December 15, 2020, when the Appeals Council declined further review. (*Id.* at 1-6.)

On February 18, 2021, Henderson filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 15, 17-18.) Henderson asserts the following assignment of error:

> (1) The ALJ's RFC determination is unsupported by substantial evidence as she failed to properly weigh the opinion of treating physician Zev Maycon, M.D.

(Doc. No. 15.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Henderson was born in August 1971 and was 48 years-old at the time of her administrative hearing (Tr. 12, 23), making her a "younger" person under Social Security regulations. *See* 20 C.F.R. §

2

404.1563(c).  She has at least a high school education and is able to communicate in English.  (Tr. 23.)

She has past relevant work as a packager machine operator and machine operator II.  (*Id.*)

## B.    Relevant Medical Evidence[2]

On September 4, 2014, Henderson saw Aaron Brzezinski, M.D., for follow up of her Crohn's

disease.  (*Id.* at 617.)  Henderson reported worsening Crohn's symptoms in the past year, including three

to five mostly liquid bowel movements daily with urgency, occasional pain in the right lower quadrant

before bowel movements, sore body, pain in her arms and legs, and fatigue.  (*Id.*)  Henderson told Dr.

Brzezinski there was no improvement in her symptoms after taking her medication.  (*Id.*)  Henderson

reported she lost her job four months ago when the plant she worked at relocated to Kentucky.  (*Id.*)  On

examination, Dr. Brzezinski found a non-distended, non-tender abdomen that was soft and depressible,

with no guarding or rebound and no palpable liver or spleen.  (*Id.* at 618.)  Dr. Brzezinski thought it was

likely that Henderson had lost response to her medication, and noted it was important to determine the

activity level and extent of the disease and make sure she did not have a stricture.  (*Id.*)  Dr. Brzezinski

ordered a colonoscopy and CT enterography, as well as blood work.  (*Id.*)  If Henderson did not have a

stricture, Dr. Brzezinski recommended staring adalimumab.  (*Id.*)

On September 12, 2014, Henderson saw primary care physician Sohair Rostom, M.D., for her

annual exam.  (*Id.* at 750-51.)  On examination, Dr. Rostom found no visible herniations, positive bowel

sounds in all quadrants, and no palpable abdominal masses.  (*Id.* at 751.)  Dr. Rostom started Henderson

on Humira.  (*Id.*)

On October 2, 2014, Henderson underwent a colonoscopy with biopsies.  (*Id.* at 711-12.)  A 5 mm

polyp was resected and retrieved.  (*Id.* at 712.)  Otherwise, the entire examined colon appeared normal.

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the
evidence cited in the parties' Briefs.  As Henderson challenges only the ALJ's findings related to her
Crohn's disease, the Court further limits its discussion of the medical evidence accordingly.

(*Id.*)

On January 3, 2015, Dr. Brzezinski notified Henderson that there were no precancerous changes in any of the biopsies and no evidence of active Crohn's disease. (*Id.* at 647.)

On August 27, 2015, Henderson saw Stephanie Kopey, D.O., for a physical consultative examination. (*Id.* at 670.) Henderson told Dr. Kopey she experienced daily diarrhea, abdominal pain, and cramping. (*Id.*) Henderson denied bowel incontinence. (*Id.*) On examination, Dr. Kopey found a soft abdomen with suprapubic tenderness, no abdominal bruit, and no pulsatile mass. (*Id.* at 672.) Henderson's diagnoses included Crohn's disease. (*Id.*) Dr. Kopey opined Henderson "may need more frequent restroom breaks and readily accessible restroom facilities." (*Id.*)

On July 24, 2015, Henderson reported bad diarrhea three to six times a day, as well as chronic fatigue and severe nausea, as a result of her Crohn's disease. (*Id.* at 514.) After losing her job and her insurance, she could no longer afford her medications, so she was not on them at the time. (*Id.*) Even on her medication, she needed to be close to a bathroom because of her diarrhea. (*Id.*) Several times while grocery shopping, she has had to stop shopping to go to the bathroom. (*Id.*)

On December 24, 2015, Henderson saw gastroenterologist Zev Maycon, M.D., for evaluation of abdominal pain and diarrhea, as well as evaluation and management of her Crohn's disease. (*Id.* at 800-01.) On examination, Dr. Maycon found no visible herniations, positive bowel sounds, soft, non-tender, and non-distended abdomen, no guarding, no rigidity, no rebound tenderness, and no organomegaly. (*Id.* at 800.) Dr. Maycon ordered small bowel follow through and bloodwork, and prescribed Bentyl and Omeprazole. (*Id.*)

On December 31, 2015, Henderson underwent a small bowel follow through that revealed irregularity of the terminal ileum compatible with Henderson's Crohn's disease, but no bowel obstruction, fixed, or dilated small bowel loops. (*Id.* at 787.)

4

On January 18, 2016, Henderson saw Dr. Maycon for evaluation of diarrhea.  (*Id.* at 1194.)  Dr. Maycon prescribed Vitamin B12, Colestid, and Golytely, and ordered a colonoscopy.  (*Id.*)

On January 25, 2016, Dr. Maycon wrote a letter to Dr. Rostom stating Henderson underwent a right hemicolectomy in 2006 and had manifestations consistent with erythema nodosum.  (*Id.* at 806.)  Dr. Maycon noted Henderson had been off medication since September 2014.  (*Id.*)  Dr. Maycon recently performed a colonoscopy on Henderson that revealed a few scattered erosions in the small bowel, ulcerations, friability, and hardness to the mucosa in the right colon, relative sparing of the left colon with scattered erosions and an occasional linear ulcer, and rectal erosions.  (*Id.*)  Dr. Maycon prescribed Prednisone, continued Colestid, and noted Henderson would eventually need Humira.  (*Id.*)

On March 25, 2016, Henderson saw Dr. Rostom for her annual exam.  (*Id.* at 728-29.)  On examination, Dr. Rostom found no visible herniations, positive bowel sounds in all quadrants, and no palpable abdominal masses.  (*Id.* at 728.)

On March 31, 2016, Henderson saw Dr. Maycon for follow up.  (*Id.* at 725.)  On examination, Dr. Maycon found positive bowel sounds, a soft, non-tender, and non-distended abdomen, no guarding, rigidity, or rebound tenderness, and no organomegaly.  (*Id.*)  Dr. Maycon ordered bloodwork and prescribed Colestid and Prednisone.  (*Id.*)

On February 6, 2017, Dr. Maycon wrote a letter to Dr. Rostom noting Henderson had undergone a colonoscopy to evaluate her response to Remicade, which Henderson had started taking in August 2016.  (*Id.* at 814.)  Dr. Maycon explained Henderson's last colonoscopy in January had revealed active Crohn's disease, right side greater than left.  (*Id.*)  The February colonoscopy revealed no active Crohn's disease but there was evidence of scarring throughout the entire colon, and small internal hemorrhoids were noted.  (*Id.*)  Dr. Maycon thought possible bile salt diarrhea might be contributing and started Henderson on bile binding acid resin.  (*Id.*)  Dr. Maycon noted Lomotil helped 50%, and that Henderson had an "excellent

response to Remicade." (*Id.*)

On March 9, 2017, Henderson saw Dr. Maycon for follow up. (*Id.* at 716.) On examination, Dr. Maycon found positive bowel sounds, a soft, non-tender, and non-distended abdomen, no guarding, rigidity, or rebound tenderness, and no organomegaly. (*Id.*)

On March 28, 2017, Henderson saw Dr. Rostom for a check up and to discuss medication for depression. (*Id.* at 713.) Regarding her Crohn's disease, Henderson reported feeling well and that her condition had mostly been controlled since her last visit. (*Id.*) Henderson told Dr. Rostom she was taking her medication as prescribed, was trying to follow a recommended diet, and was trying to improve her exercise routine. (*Id.*) Henderson described her Crohn's disease as mild. (*Id.*)

On August 10, 2017, Henderson saw Dr. Maycon for follow up of her Crohn's disease and diarrhea. (*Id.* at 950.) On examination, Dr. Maycon found positive bowel sounds, a soft, non-tender, and non-distended abdomen, no guarding, rigidity, or rebound tenderness, and no organomegaly. (*Id.*) Henderson's diagnoses included diarrhea, unspecified. (*Id.*)

On August 22, 2017, Henderson saw Dr. Rostom for a checkup and to discuss lab work and medications. (*Id.* at 961.) Dr. Rostom noted Henderson's Crohn's disease was not controlled as she was having diarrhea every day. (*Id.* at 962.)

On October 15, 2017, Sai Nimmagadda, M.D., completed a medical interrogatory. (*Id.* at 986-89.) Dr. Nimmagadda noted Henderson's most recent colonoscopy "suggest[ed] that the bowel is free from active inflammation" and determined the records "confirm[ed] the chronic status of intermittent Crohn's disease" with "some intermittent flares that has resulted in some pain and at times increased stools but is not near LL." (*Id.* at 989.)

On June 7, 2018, Henderson saw Dr. Maycon for follow up of her Crohn's disease. (*Id.* at 1208.) Dr. Maycon continued her Colestipol, Vitamin B12, and Remicade. (*Id.*)

6

A colonoscopy done on August 15, 2018 revealed a normal neoterminal ileum, some scarring from previous Crohn's disease but no activity and no mucosal lesions in the right colon, and normal remainder of the left colon, which was biopsied for surveillance. (*Id.* at 1211.) Dr. Maycon continued Remicade and ordered a repeat colonoscopy in two years. (*Id.*)

On February 21, 2019, Henderson saw Dr. Maycon for follow up of her Crohn's disease. (*Id.* at 1213.) Dr. Maycon continued Colestipol, Vitamin B12, and Remicade, and prescribed Prednisone. (*Id.*)

On May 23, 2019, Henderson saw Dr. Maycon for follow up of her Crohn's disease. (*Id.* at 1214.) Dr. Maycon continued Colestipol, Vitamin B12, and Remicade. (*Id.*) Dr. Maycon started Henderson on Lomotil and Humira and ordered blood work. (*Id.*)

On September 26, 2019, Henderson saw Dr. Maycon for follow up of her Crohn's disease. (*Id.* at 1215.) Dr. Maycon continued Humira, Lomotil, and Vitamin B12, and discontinued Colestipol and Remicade. (*Id.*) Dr. Maycon noted Henderson was to take 1-2 tabs of Lomotil every 6 hours after each loose stool. (*Id.*) Dr. Maycon diagnosed Henderson with unspecified diarrhea and ordered blood work. (*Id.*)

On June 10, 2020, Henderson underwent a colonoscopy with biopsy. (*Id.* at 1272.) Dr. Maycon noted a right hemicolectomy with no evidence of active Crohn's in the small bowel or colon. (*Id.*)

On July 9, 2020, Dr. Maycon completed a residual functional capacity form stating he had treated Henderson's Crohn's disease since December 24, 2015. (*Id.* at 1265-67.) Dr. Maycon opined Henderson's major impairment was due to chronic diarrhea four to five times a day with urgency and little warning, requiring frequent restroom access. (*Id.* at 1265.) Dr. Maycon noted Henderson took Lomotil for chronic diarrhea, which had just been increased to 8 tablets a day, and she had a varied response to Colestid, for bile salt diarrhea. (*Id.* at 1265-66.) Dr. Maycon stated Henderson had a variable response to therapy for her bowel movements and that she rarely had formed stool. (*Id.* at 1266.) Dr. Maycon opined

7

Henderson "[m]ay have intermittent episodes of worsening diarrhea" that may cause her to miss three or four days a month.  (*Id.*)  Dr. Maycon further opined Henderson would need four to five unscheduled bathroom breaks a day.  (*Id.*)  Dr. Maycon explained that Henderson's Crohn's disease had been well controlled since 2018, but she had an ongoing issue of frequent urgency due to her right hemicolectomy and bile salt diarrhea.  (*Id.* at 1267.)

**C.      State Agency Reports**

On September 15, 2015, Diane Manos, M.D., reviewed Henderson's file and opined Henderson could occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, stand/walk for a total of about six hours in a workday, and sit for a total of about six hours in a workday.  (*Id.* at 151-52.)  Henderson could frequently stoop and crouch, occasionally climb ladders, ropes, or scaffolds, and was limited in her ability to perform bilateral fingering.  (*Id.*)

On January 26, 2016, on reconsideration, Gerald Klyop, M.D., affirmed Dr. Manos' findings.  (*Id.* at 165-66.)

**D.      Hearing Testimony**

During the July 23, 2020 hearing, Henderson testified to the following:

- She cannot work now because of having to use the bathroom so much.  (*Id.* at 46.) She had to even when she was still working, but her supervisor understood her situation and was lenient, so other coworkers relieved her when she needed to go to the bathroom.  (*Id.*)  That happened three to four times a night.  (*Id.*)  Her diarrhea has gotten worse over the years.  (*Id.* at 46-47.)  Her medications have helped somewhat, but not with the diarrhea.  (*Id.* at 47.)  They help her nausea and vomiting. (*Id.*)  She uses the bathroom eight to ten times a day.  (*Id.* at 48.)  She has daily bowel incontinence.  (*Id.*)  She also has cramping and strain in her stomach and bowels. (*Id.*)  She has diarrhea no matter what she eats.  (*Id.* at 53.)  She cannot even get from one room in her house to the bathroom fast enough.  (*Id.* at 55.)  She may be in the bathroom for 15-30 minutes at a time.  (*Id.*)  Sometimes she has to soak in the bathtub because her back gets so swollen and irritated.  (*Id.*)  If she has to go to a doctor's appointment or go out somewhere, she doesn't eat for a day or two so she will not have an accident.  (*Id.* at 56.)  Not eating for a few days causes her to be tired.  (*Id.*)

- She does not go the store because of her anxiety of being around people and worrying about having to go to the bathroom.  (*Id.* at 49.)  She drives to her mom's house a mile away once or twice a week.  (*Id.*)  She drives to the doctor.  (*Id.*)  Sometimes she visits her brother and father, who live fifteen minutes away.  (*Id.* at 50.)  She watches the news but doesn't watch TV or read.  (*Id.*)  She may make herself something to eat, go to the bathroom, and lay down because of fatigue and back aches.  (*Id.*)  She uses social media and is on the computer for maybe an hour and a half a day.  (*Id.* at 50-51.)  She does a little bit of household chores or vacuuming when she can.  (*Id.* at 51.)  She does some laundry, but her niece usually helps her.  (*Id.*)

During the hearing, medical expert Sai Nimmagadda also testified to the following:

- Dr. Maycon's medical source statement was somewhat consistent and somewhat inconsistent with his review of the record.  (*Id.* at 58.)  While Dr. Maycon suggested increased bathroom use because of diarrhea and urgency, there was only intermittent diarrhea and abdominal pain, and the more recent medical records did not mention abdominal pain and frequent stool.  (*Id.*)  He does not believe the objective record reflects or extends for the duration of increased bowel movements.  (*Id.*)

- He is board certified in allergy and pulmonary medicine.  (*Id.* at 59.)  He sees patients in his practice with Crohn's disease, inflammatory disease, lupus, and other gastrointestinal manifestations.  (*Id.*)

- Whether a colectomy could cause someone to have urgency and diarrhea without active Crohn's disease is dependent on so many factors of the colectomy, and without seeing it "objectively defined in the record," it was hard for him to quantify that in a specific state.  (*Id.* at 61.)  It could occur, but it is "very variable."  (*Id.* at 62.)

- The "real-time records" from the gastroenterologist tied Henderson's symptoms to a bile salt problem and he prescribed medication to address that, and then after that, there was no mention of diarrhea.  (*Id.* at 63.)

- The documents show intermittent diarrhea, but not on a continual basis.  (*Id.* at 67.)  He does not see differential weight loss or signs that active diarrhea is causing secondary effects.  (*Id.* at 68.)  Diarrhea has not been a chronic complaint of Henderson's.  (*Id.* at 69.)

- Urgency is a very subjective determination, and while it is is not impossible to have it, it is variable and depends on many factors.  (*Id.* at 70.)  It is not documented in the record on a persistent basis.  (*Id.*)

The VE testified Henderson had past work as a machine packager and machine operator II.  (*Id.* at 74.)  The ALJ then posed the following hypothetical question:

> [A]ssume a hypothetical individual the claimant's age and education with the past jobs you described for her.  Further assume that the individual can

9

occasionally climb ladders, ropes, and scaffolds, she can frequently stoop and crouch, should avoid exposure to dangerous moving machinery and unprotected heights, and should perform no commercial driving.  She can handle and finger bilaterally.  She can perform simple and routine tasks in an environment free of fast-paced production requirements or strict production quotas with infrequent changes, with changes explained in advance.  She can have occasional interaction with the general public.  She should not be required to perform tasks that require arbitration, confrontation, negotiation, directing the work of others or being responsible for the safety or welfare of others.  Could the hypothetical individual the [sic] past jobs you've described as actually or generally performed in the national economy?

(*Id.* at 76-77.)

The VE testified the hypothetical individual would not be able to perform Henderson's past work as a machine packager and machine operator II.  (*Id.* at 77.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as marker, routing clerk, and mail clerk.  (*Id.* at 78.)

The ALJ changed the exertional level to sedentary, and the VE identified three other representative jobs in the national economy the hypothetical individual could perform.  (*Id.* at 78-79.)  The ALJ asked whether the VE's testimony in response to hypotheticals one and two would change if the hypothetical individual requires ready access to restroom facilities, and the VE testified it would not.  (*Id.* at 79-80.)

In response to questioning from the ALJ, the VE testified the off-task time allowance was 10%, which allowed for six minutes on the hour, which would allow time for quick restroom breaks.  (*Id.* at 80.)  If additional breaks were on an acute basis, it would be permitted; but if the additional breaks occurred over a long period of time, it would affect the off-task rate and be seen as excessive breaks, and the individual would not be able to maintain competitive full-time employment.  (*Id.* at 81.)

In response to questioning from Henderson's counsel, the VE testified that one additional break that is more than seven minutes a day is work preclusive.  (*Id.* at 82.)

10

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists

11

in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Henderson was insured on her alleged disability onset date, May 2, 2014, and remained insured through December 31, 2020, her date last insured ("DLI").  (Tr. 12-13.)  Therefore, in order to be entitled to POD and DIB, Henderson must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2.    The claimant has not engaged in substantial gainful activity since May 2, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: Crohn's disease status post right hemicolectomy, mild degenerative disc disease of the lumbar spine, lumbar spondylosis, carpal tunnel syndrome, obesity, depression, and anxiety (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally climb ladders, ropes and scaffolds.  She can frequently stoop and crouch.  She should avoid exposure to dangerous moving machinery and unprotected heights and should perform no commercial driving.  She can frequently handle and finger bilaterally.  She requires ready access to a restroom.  The claimant can perform simple routine tasks in an environment free of fast-paced production requirements or strict production quotas and with infrequent changes with changes explained in advance.  She can have occasional interaction with the general public.  She should not be required to perform tasks that involve arbitration, confrontation,

negotiation, directing the work of others or being responsible for the safety or welfare of others.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on August **, 1971 and was 42 years old, which is defined as , [sic] on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 2, 2014, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-25.)

## V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

14

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.    ANALYSIS

In her sole assignment of error, Henderson asserts the ALJ erred in failing to weigh the opinion of treating gastroenterologist Dr. Maycon in accordance with the case law, and further erred in failing to state what weight she assigned to Dr. Maycon's opinion.  (Doc. No. 15 at 9.)  Henderson argues these errors are harmful, as had Dr. Maycon's opinion been properly weighed the ALJ would have found her unable to perform full time work.  (*Id.*)

The Commissioner responds the ALJ properly weighed Dr. Maycon's opinion.  (Doc. No. 17 at 8-11.)  The Commissioner asserts that Henderson's argument that the ALJ erred "by not expressly articulating what 'level' of weight she gave to Dr. Maycon's opinion is a red herring," as it is "clear from a reading of the decision as a whole that the ALJ did not adopt Dr. Maycon's opined limitations, and any error would have no effect on the outcome of the case, and therefore would be harmless."  (*Id.* at 11-12.)

In her reply, Henderson argues the Commissioner overlooks the fact that the ALJ "'must show [her] work'" by analyzing the regulatory factors and she failed to do so here.  (Doc. No. 18 at 1-2) (citing *Schmitt v. Comm'r of Soc. Sec.*, No. 1:20-CV-01864-PAG, 2021 WL 5236349, at *11 (N.D. Ohio Oct. 15, 2021), *report and recommendation adopted by* 2021 WL 5234724 (N.D. Ohio Nov. 10, 2021)). Furthermore, Henderson asserts the ALJ's "boilerplate language does not permit this Court meaningful review."  (*Id.* at 2.)  Therefore, the ALJ failed to properly evaluate Dr. Maycon's opinion.  (*Id.*) Henderson argues that the Commissioner's assertion that there is no support for Dr. Maycon's opinion

15

beyond her own testimony is a "selective reading of the medical evidence," one which the ALJ also engaged in to support her opinion.  (*Id.* at 2-3.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c),[3] and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)."  *Id.*  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Social Security Ruling ("SSR") 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).[4]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart,* 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

---

[3] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).
[4] SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017.  *See* SSA 17-2p, 2017 WL 3928306, at *1 (SSA Mar. 27, 2017).

16

399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188, at *4 (SSA July 2, 1996)).[5] Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[6] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188, at *5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378

---

[5] SSR 96-2p has been rescinded. This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298, at *1.

[6] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.[7]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

The ALJ weighed the opinion of Dr. Maycon, as well as the opinion of testifying expert Dr. Nimmagadda, as follows:

---

[7] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. §§ 404.1527(c), 416.927(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion.  *Id*.  § 404.1527(c)(6)."  *Gayheart*, 710 F.3d at 376.

The record contains multiple instances of testimony and responses to medical interrogatories by Sai Nimmagadda, M.D., which occurred throughout the appeals process. For instance, on October 15, 2017, he opined that the claimant's Crohn's disease had waxed and waned at times throughout various treatment protocols with stools from two to three times a day as high as three to five days at a time, per the claimant's report. He stated that recent treatment showed intermittent Crohn's disease with some flares that resulted in pain and at times increased stools, but not near listings level. He opined that she was capable of at least light exertional work (15F). On January 28, 2018, Dr. Nimmagadda responded to supplemental interrogatories submitted by Mr. Bloom.  These questions asked whether scarring throughout the entire colon could reasonable cause symptoms and limitations, even in the absence of active Crohn's disease. He also asked whether the claimant's Crohn's disease and/or treatment protocols, could reasonably cause the claimant to have up to five or six bowel movements (or urgency/sensation of oncoming bowel movements) within an eight-our span (16F).  In reply, Dr. Nimmagadda noted that possible symptoms included cramping, pain and diarrhea and stated that limitations would be from urgency and dependent on pain. He stated that limitations due to treatment protocols and Crohn's disease would be intermittent and limited by the treatments, which would control symptoms. Again, he noted that increased bowel movements were possible, but noted that bowel movements would be for short periods of under three minutes (16F). The opinions of Dr. Nimmagadda and the resulting interrogatories and testimony at the hearing are given great weight. The undersigned acknowledges the arguments made by the claimant's representative but notes that while the claimant's subjective allegations are consistent with the disease process of Crohn's disease, more is required to bridge the gap between the claimant's subjective complaints and a finding in the residual functional capacity assessment. Specifically, while the record does indicate a history of surgery to the colon resulting in scar tissue which showed up on subsequent studies (9F/10), and while the claimant did complain of diarrhea sporadically throughout the record it was intermittent and nothing in the record corroborates the frequency with which she alleges she has bowel movements in a day (7F; 9F/1-3; 13F/28-29; 13F/39-41 and 24F). As such, Dr. Nimmagadda's testimony that the claimant's complaints were possible, but were not supported by objective findings in the record is consistent and his testimony is given great weight. The undersigned notes that the claimant's representative questioned the professional qualifications of the medical expert in terms of his scope of practice and history of treating claimant's [sic] with Crohn's disease.  However, Dr. Nimmagadda's testimony established a history of treating claimants with Crohn's disease over many years, and his experience and education provide a basis for his opinion.

> Finally, the opinion of Zen Maycon, M.D., that the claimant's impairments were due to chronic diarrhea four to give times a day with urgency and little warning requiring frequent bathroom access, as well as absences of four days per month, are not consistent with the record. Dr. Maycon stated that the claimant's scarring, could cause symptoms even in the absence of active Crohn's disease. However, these statements cannot overcome the general lack of support for such a finding in the objective records, which did indicate some complaints of diarrhea, very limited treatment specifically for diarrhea, and little support for the frequency with which the claimant alleges she experiences bowel movements in a given day (7F; 9F/1-3; 13F/28-29; 13F/39-41 and 24F).  Therefore, despite being a treating source, he is not entitled to controlling or even great weight because his opinion is not supported by or consistent with his own treatment records.

(Tr. 21-22.)

Although the ALJ stated Dr. Maycon's opinion was not entitled to controlling weight or great weight, the ALJ erred in failing to articulate how much weight (if any) she assigned to Dr. Maycon's opinion and failing to consider many of the regulatory factors as discussed in *Wilson*.  As the Sixth Circuit has explained, "[i]f the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Blakley*, 581 F.3d at 406.  *See also Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. March 17, 2016) ("An ALJ must also determine what weight – if not controlling– to give the treating physician's opinion" by applying the factors set forth in 20 C.F.R. § 404.1527); *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 860 (6th Cir. Jan. 7, 2011) (finding that "[e]ven if the ALJ does not give controlling weight to a treating physician's opinion, he must still consider how much weight to give it" using the factors set forth in 20 CFR § 404.1527); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. April 28, 2010) (same); *Roush v. Barnhart*, 326 F. Supp. 2d 858, 867 (S.D. Ohio 2004) ("Even where the ALJ determines not to give the opinions of a treating physician 'controlling' weight, Social Security regulations and rules nonetheless require the ALJ to determine and

20

articulate the amount of weight given to the opinions.")  Indeed, federal courts have not hesitated to

remand where an ALJ fails to specify the amount of weight accorded a treating physician opinion and

discuss the regulatory factors set forth in 20 CFR § 404.1527.  *See, e.g., Schmitt*, 2021 WL 5236349, at

*11 ("When an ALJ chooses not to ascribe controlling weight to a treating source's opinions, the ALJ

must show his work by analyzing factors set forth in *Wilson*."); *Quattlebaum v. Comm'r of Soc. Sec.*, 850

F. Supp. 2d 763, 771 (S.D. Ohio 2011) (remanding where "the ALJ's decision does not reflect an analysis

of the regulatory factors or an indication of the weight he actually accorded to [the treating physician

opinion]."); *Harmon v. Astrue*, No. 5:09CV2765, 2011 WL 834138, at *9 (N.D. Ohio Feb. 8, 2011),

*report and recommendation adopted by* 2011 WL 825710 (N.D. Ohio Mar. 4, 2011) (remanding where

ALJ failed to articulate the weight given to the treating source opinion and failed to consider all of the

appropriate factors in weighing the opinion); *Saunders v. Comm'r of Soc. Sec.*, No. 2:14-cv-493, 2015 WL

4450656, at *6 (S.D. Ohio July 20, 2015), *report and recommendation adopted by* 2015 WL 5582315

(S.D. Ohio Sept. 23, 2015) (remanding where ALJ failed to articulate the weight assigned to treating

physician opinion); *Horn v. Comm'r of Soc. Sec.*, No. 1:13cv610, 2014 WL 5107598, at *7 (S.D. Ohio

Oct. 10, 2014) (finding that ""[w]hile it is implicitly clear that the ALJ rejected virtually all of [the

treating source]'s opinions, remand is required because he failed to explicitly state what weight he was

giving to [those] opinions.").  Here, the ALJ offered no discussion of the length of the treatment

relationship, the frequency of the examinations, the nature and extent of the treatment relationship, or

other factors such as the fact that Dr. Maycon, in contrast to Dr. Nimmagadda, was a board-certified

gastroenterologist or his familiarity with Henderson's treatment records.  The ALJ's failure to either

articulate the amount of weight given to Dr. Maycon's opinion or discuss many of the factors set forth in

20 C.F.R. § 404.1527 runs contrary to Social Security regulations and rules and inhibits proper judicial

review.  *See, e.g., Blakley*, 581 F.3d at 406; *Quattlebaum*, 850 F. Supp. 2d at 771; *Harmon*, 2011 WL 834138, at *9.

The Commissioner argues that the ALJ's "explanation that the opinions were inconsistent with the record provided substantial support for her decision" to discount Dr. Maycon's "extreme opinions."  (Doc. No. 17 at 9.)  However, the fact remains that substantial evidence cannot save the ALJ's failure to comply with Social Security regulations and rules, as well as the law of this circuit, in evaluating Dr. Maycon's opinion.[8]  *Blakley*, 581 F.3d at 399 ("[E]ven if we were to agree that substantial evidence supports the ALJ's weighing of each of these doctors' opinions, substantial evidence alone does not excuse non-compliance with 20 C.F.R. § 404.1527(d)(2) as harmless error.")  Moreover, a careful review of the ALJ's decision reveals that the ALJ failed to discuss the notations in the 2019 treatment records from Dr. Maycon documenting a prescription for Lotomil, which Dr. Maycon explained in his 2020 opinion was for treatment of diarrhea, and a diagnosis of diarrhea.  (Tr. 19-22.)  "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).

In sum, for all these reasons, the Court find the ALJ failed to follow Social Security regulations and rules, as well as the law of this circuit, in evaluating Dr. Maycon's opinion.  Remand is required.

---

[8]  The Commissioner makes no argument that the ALJ's decision falls within any of the exceptions allowing for harmless error to excuse non-compliance with the treating source rule as set forth by the Sixth Circuit in *Cole v Astrue*, 661 F.3d 931 (6th Cir. 2011), and the Court shall not make such arguments for her.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED for further consideration consistent with this opinion.

**IT IS SO ORDERED.**

Date: April 22, 2022                                            _s/ Jonathan Greenberg_
                                                                          Jonathan D. Greenberg
                                                                          United States Magistrate Judge